UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **MARKEITHIA V. YOUNG,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 2:13-CV-00100-RDP |
| **CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,**[1] | } |
| **Defendant.** | } |

## MEMORANDUM OF DECISION

Markeithia V. Young ("Plaintiff") brings this action pursuant to Title II of Section 205(g) and Title VII of Section 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision by the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). *See* 42 U.S.C. §§ 405(g) and 1383(c). Based upon the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

**I.     Proceedings Below**

This action arises from Plaintiff's applications for a period of disability, DIB, and SSI, filed protectively on June 28, 2010, alleging disability beginning June 25, 2010. (Tr. 21, 143, 150). The Social Security Administration denied Plaintiff's applications on November 9, 2010. (Tr. 21, 83-84). Unsatisfied with the Commissioner's decision, Plaintiff requested a hearing

---

[1] This suit was originally brought against Michael J. Astrue, the Commissioner of the Social Security Administration at the time the suit was filed. However, as of Feburary 14, 2013, the Acting Commissioner of the Social Security Administration is Carolyn W. Colvin, making it proper to substitute her as Defendant under Rule 25(d)(1) of the Federal Rules of Civil Procedure.

before an Administrative Law Judge. (Tr. 100).  Plaintiff's request was granted, and a hearing was held on March 6, 2012 before Administrative Law Judge George W. Merchant ("ALJ"). (Tr. 35-64).  The ALJ reached his decision on March 14, 2012, concluding at that time that Plaintiff had not been under a disability within the meaning of §§ 216(i), 223(d), or 1614(a)(3)(A) since June 25, 2010, the alleged onset date of her disability. (Tr. 21, 30).  The Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision (Tr. 1-6), rendering the Commissioner's decision final and a proper subject of this court's judicial review. *See* 42 U.S.C. §§ 405(g) & 1383(c)(3).

At the time of the ALJ's decision, Plaintiff was twenty-three (23) years old. (Tr. 29, 41). Plaintiff has a GED and has completed two years of college. (Tr. 41, 176).  Plaintiff's prior work experience includes time spent as a cashier, customer service representative, hotel housekeeper, and retail assistant. (Tr. 23, 50, 168-69, 194).  In her application, Plaintiff alleged disability based on arthritis and depression. (Tr. 176).  At her hearing, Plaintiff's counsel alleged disability based on rheumatoid arthritis, lupus, and anxiety/depression. (Tr. 39).

Plaintiff's earliest, available medical records date to September 12, 2007, when she first sought psychological treatment at the Oasis Women's Counseling Center ("Oasis"). (Tr. 237-42). Plaintiff also visited Oasis on October 8, 2007 (Tr. 240), April 9, 2008 (Tr. 230-36), and September 11, 2008 (Tr. 226-29).  Throughout these visits, similar observations pepper the notes of Plaintiff's attending therapists, who emphasize that Plaintiff exhibits symptoms of anxiety, depression, and anger. (Tr. 229, 236).

It appears that Plaintiff also sought psychological help from other sources, as she visited Birmingham Health Care on April 10, 2008. (Tr. 243-46).  At that time, she complained of worsening feelings of anger and anxiety, trouble eating and sleeping, and frequent

nausea/occasional vomiting. (Tr. 243).  The evaluating medical professional concluded that Plaintiff was suffering from post-partum depression and anxiety. (*Id.*).

On October 7, 2010, William B. Beidleman, Ph.D. conducted a comprehensive psychological evaluation of Plaintiff at the behest of the Alabama Disability Determination Service. (Tr. 272-74).  Beidleman noted that Plaintiff was slightly irritable during the examination, displayed symptoms of anxiety and depression, and seemed particularly bereaved by her multiple miscarriages. (Tr. 273).  Beidleman's chief diagnostic impressions were that Plaintiff had a "generalized anxiety disorder with possible history of panic symptoms, as well as dysthymic disorder, late onset," and he opined that Plaintiff "may have difficulty presently coping with ordinary work pressures." (Tr. 274).

Although Plaintiff's recorded psychological history is substantial, it pales in comparison to the numerous records that document Plaintiff's past physical ailments.  Judging by the record, Plaintiff has made good use of the emergency department at Princeton Baptist Hospital, seeking treatment between April 2, 2009 and October 13, 2011 for neck and back pain (Tr. 302-14), elbow pain (Tr. 315-23), abdominal pain/pelvic pain/complications from miscarriage (Tr. 324-38, 357-66, 367-76), cold and flu symptoms (Tr. 339-48), ear pain (Tr. 349-56), bronchitis (Tr. 377-85), difficulty breathing and coughing (Tr. 386-94), knee and hand pain (Tr. 395-404), general pain and swelling (Tr. 405-413), wrist pain (Tr. 414-26), chest pain (Tr. 414-26, 427-36, 437-49, 472-88, 492-504), rectal bleeding (Tr. 427-36), rash (Tr. 450-57), limb pain (458-71), and arthritis (Tr. 492-504).  Likewise, she has been a frequent visitor to Cooper Green Hospital's emergency room, stopping in between September 15, 2006 and June 23, 2010 with complaints of chest pain (Tr. 252-54), wrist pain and inflammation (Tr. 255-59), and an orbital contusion (Tr.

266-69). As is evident from her emergency history, Plaintiff has frequently experienced episodes of pain, particularly in her joints and extremities.

However, Plaintiff's medical history is not limited to brief, emergency room visits. Indeed, Plaintiff has been evaluated at length by numerous doctors, namely Dr. Laura Hughes, Dr. Shirley Jones, and Dr. Tim Prestley. (Tr. 247, 248, 249, 250, 275-79, 295-300, 534-39, 540-45).

Plaintiff first saw Dr. Hughes at Cooper Green's Rheumatology Clinic on June 21, 2010, after receiving emergency room treatment for pain in her left wrist a few days earlier. (Tr. 250-51, 255-57). Dr. Hughes noted that Plaintiff complained not only of pain in her left wrist, but also of pain in her right shoulder, right elbow, right knee, and left finger joints. (Tr. 250). A review of systems was negative (save for "some constipation"), and a physical examination revealed little out of the ordinary other than left wrist pain. (Tr. 250). Dr. Hughes' prescribed program of treatment included lab testing, Prilosec, a wrist splint, and a follow-up in two weeks. (Tr. 251).

On July 6, 2010, Plaintiff was examined by an unidentified doctor at Cooper Green Hospital. (Tr. 249). Plaintiff complained of intermittent chest pain, shoulder pain, left elbow pain, right knee pain, and morning stiffness lasting more than an hour. (Tr. 249). The attending physician's "impression" was that Plaintiff displayed symptoms of "polyarticular symmetric arthralgia," swelling, rheumatoid arthritis, and undifferentiated arthralgia. (Tr. 249). The doctor also listed differential diagnoses of rheumatoid arthritis, reactive arthritis, Lupus, Panoviral, or Hepatitis. (Tr. 249).

Plaintiff visited Dr. Hughes again on August 12, 2010, complaining of left wrist pain (characterized as "polyarthralgia" in Dr. Hughes' notes) and shortness of breath. (Tr. 248).

Plaintiff also reported to Dr. Hughes that she had seem some improvement in the condition of her left wrist, but had developed pain in her left knee and experienced morning stiffness lasting more than one hour in almost all of her joints. (Tr. 248). In her notes, Dr. Hughes described Plaintiff as generally suffering from "subacute onset of migratory polyarthralgia," but deemed Plaintiff's physical examination "unremarkable," except for "mild lateral joint rim tenderness" in the left knee. (Tr. 248).

On September 15, 2010, Plaintiff was seen by Dr. Shirley Jones in Cooper Green's lupus clinic. (Tr. 247). Dr. Jones' notes included the following four observations: (1) "Lupus—pt being followed by Rheu[matology]," (2) Anxiety, (3) Insomnia, and (4) "Drug Use—Marijuana to Sleep." (Tr. 247). Otherwise, Dr. Jones' findings were relatively standard, as a review of systems came back negative and a physical examination proved normal. (Tr. 247).

On October 12, 2010, Plaintiff was evaluated by consultative examining (CE) physician Tim Prestley. Dr. Prestley personally examined Plaintiff, but was only able to review her medical history in a limited manner, as he only had her records from Oasis at his disposal. (Tr. 275). Dr. Prestley's overall assessment was as follows: "Exam findings all normal, with the exception the claimant is appearing to be uncomfortable and in pain. She had normal range of motion and no evidence of fusion or crepitus in her joints. There seen [sic] to be no objective finding that would limit the claimant['s] physical ability based on records provided my exam today." (Tr. 278). As a result, Dr. Prestley concluded, "Claimant could stand or walk for 8 hours during an 8-hour day with frequent breaks. Claimant can sit for 8 hours without frequent breaks. No postural limitations apply. In terms of manipulative here left hand historically has a decrease ability fin[e] manipulation." (Tr. 278).

At the behest of Plaintiff's counsel, Dr. Jones and Dr. Hughes also opined on Plaintiff's potential functionality, completing assessment forms regarding Plaintiff's physical capacity, pain, and fatigue. (Tr. 295-300, 534-39, 540-45). On December 10, 2010, Dr. Jones completed these series of forms, asserting that Plaintiff was capable of lifting/carrying five pounds occasionally, sitting two hours in an eight-hour workday, and standing zero hours in an eight-hour workday. (Tr. 295). Dr. Jones also indicated that Plaintiff's level of pain is such that it would be "distracting to adequate performance of daily activities or work," and that her level of fatigue had the potential to negatively effect work performance. (Tr. 297, 299).

Dr. Jones filled out the same forms on December 21, 2011, providing a more positive outlook than she had previously. (Tr. 534-39). This time, she predicted that Plaintiff was capable of lifting/carrying "twenty pounds occasionally to ten pounds frequently," sitting for eight hours in an eight-hour workday, and standing for four hours in an eight-hour workday. (Tr. 534). Likewise, she opined that neither Plaintiff's pain, nor her fatigue were of such a degree that they would "prevent functioning in everyday activities or work." (Tr. 536, 538).

On January 30, 2012, Dr. Hughes also completed these forms. (Tr. 540-45). Dr. Hughes alleged that Plaintiff was capable of lifting/carrying five pounds occasionally, sitting for four hours in an eight-hour workday, and standing for two hours in an eight-hour workday. (Tr. 540). Her assessment of Plaintiff's pain and fatigue levels mirrored Dr. Jones' initial estimates, as she indicated that Plaintiff's pain and fatigue would have a definite effect on any daily activities or work. (Tr. 542, 544).

Finally, it should be noted that Plaintiff's only known hospital stay took place in December 2011, when she was admitted to Princeton Baptist Hospital with complaints of chest pain and shortness of breath. (Tr. 505-23). The attending physician's impression at the time was

that Plaintiff was experiencing "pleuritic chest pain," a diagnosis made in the context of Plaintiff's past history of "lupus, rheumatoid arthritis, [and] Sjogren." (Tr. 507).

## II.     The ALJ's Decision

Disability within the meaning of the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform

past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

In the instant case, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of her disability, and that Plaintiff suffers from several severe impairments—lupus with diffuse arthralgia, anxiety disorder, and dysthymic disorder. (Tr. 23-24).  However, despite these maladies, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 24).

Subsequently, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but is limited to jobs that require no more than frequent left side fine manipulation, are low stress in nature, and have only occasional changes in the work place. (Tr. 25).  In making this determination, the ALJ gave little weight to the opinions of Dr. Jones and Dr. Hughes, concluding that their opinions were inconsistent with their own treatment notes, the findings of the CE physician (Dr. Prestley), and Plaintiff's "broad activities of daily living." (Tr. 28).  In contrast, the ALJ gave great weight to Dr. Prestley's opinion, which he found to be consistent with the record as a whole. (Tr. 28). Finally, the ALJ noted that Plaintiff had no past relevant work, but determined, with the assistance of testimony from a vocational expert, that there are jobs that exist in significant

numbers in the national economy that Plaintiff can perform. (Tr. 28-29). Based upon this analysis, the ALJ came to the conclusion that Plaintiff is not disabled. (Tr. 30).

### III. Plaintiff's Argument for Reversal

Plaintiff's only argument as to why this court should reverse the decision of the ALJ is that "[t]he ALJ erred in failing to give greater weight to the opinion of Plaintiff's treating physicians," Dr. Jones and Dr. Hughes, whose evaluations of Plaintiff (Tr. 295-300, 534-39, 540-45) suggest a more circumscribed residual functional capacity than was ultimately arrived at by the ALJ. (Pl.'s Mem. 6).

### IV. Standard of Review

Judicial review of disability claims under the Act is limited to whether the Commissioner's decision is supported by substantial evidence or whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). "Substantial evidence is less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); see also *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). The Commissioner's factual findings are conclusive when supported by substantial evidence. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). If supported by substantial evidence, the Commissioner's findings must be affirmed, even if the record preponderates against the Commissioner's findings. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); see also *Martin*, 894 F.2d at 1529. Legal standards are review *de novo*. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

**V.     Discussion**

After careful review, the court concludes that the ALJ's fact finding is supported by substantial evidence and that correct legal standards were applied.

**A.     The ALJ Did Not Err in According Little Weight to the Opinions of Plaintiff's Treating Physicians**

Plaintiff asserts that the ALJ erred in discounting the opinions of her treating physicians, Dr. Jones and Dr. Hughes, arguing that "[t]hese primary care physicians were in the best position to understand their patient's complaints and conditions longitudinally in combination." (Pl.'s Mem. 6).  The court addresses this singular argument below.

Plaintiff is correct in her general assertion that the opinions of treating physicians "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 123 F.3d 1436, 1440 (11th Cir. 1997).  To this end, the Social Security Administration's own regulations clearly note that "[g]enerally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R § 404.1527(c)(2).

However, the opinions of treating physicians "may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Edwards v. Sullivan*, 937 F.3d 580, 583-84 (11th Cir. 1991).  Indeed, the Eleventh Circuit has found that "good cause" exists to discount a treating physician's opinion when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."

*Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440). In fact, the Eleventh Circuit has approved numerous findings of "good cause" in the past, with the caveat that "the Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (internal quotations omitted); *see, e.g.*, *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Phillips*, 357 F.3d at 1241; *Edwards*, 937 F.3d at 583-84; *McSwain*, 814 F.3d at 619; *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).

Here, the ALJ properly employed the approach prescribed by the Eleventh Circuit in discounting the opinions of Plaintiff's treating physicians, as he specified the weight that he was giving to the opinions and provided a number of reasons for doing so. (Tr. 28).  Indeed, he clearly noted that he was giving the treating physicians' opinions "little weight," because they were 1) inconsistent with the record (including both the notes of the treating physicians themselves and the findings of the consultative medical examiner), 2) unsupported by "medically acceptable clinical and laboratory techniques," and 3) inconsistent with "claimant's broad activities of daily living." (Tr. 28).

However, the ALJ's discounting of the treating physicians' opinions was not only sound in form, but also in reasoning.  For instance, his primary rationale—the inconsistency between the record (particularly the notes of the treating physicians) and the treating physicians' assessments of Plaintiff's physical capacity, pain, and fatigue (*i.e.*, their opinions)—is, in fact, supported by the record.  Indeed, apart from various manifestations of joint pain, there are no other indications of major physical issues in the treatment notes of either Dr. Jones or Dr. Hughes. (Tr. 247, 248, 250-51).  These findings, or the lack thereof, conflict with the treating

physicians' later, more dire prognostications as to Plaintiff's functional capacity (Tr. 295-300, 534-39, 540-45), thereby providing the ALJ with "good cause" to discount the opinions. *Phillips*, 357 F.3d at 1241 (noting that "good cause" exists where the "treating physician's opinion was conclusory or inconsistent with the doctor's own medical records").  Likewise, the ALJ was justified in discounting the treating physicians' opinions because they lacked the support of "medically acceptable clinical and laboratory techniques": the doctors' opinions were not issued in conjunction with any examination or testing of Plaintiff, but were instead completed many months after either doctor had last treated Plaintiff. (Tr. 295-300, 534-39, 540-45).  Finally, the ALJ extensively developed the record regarding Plaintiff's daily activities,[2] lending great support to the last of the ALJ's articulated reasons for discounting the treating physicians' opinions─*i.e.*, the opinions were not consistent with the realities of Plaintiff's daily life.

Because the ALJ properly specified the weight being given to the opinions of Plaintiff's treating physicians and provided numerous examples of "good cause" in support of his decision to discount such opinions, the court concludes that the ALJ did not err and the Commissioner's final decision is due to be affirmed.

## VI.     Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and that proper legal standards were applied in reaching this decision.  Accordingly, the Commissioner's final decision is due to be affirmed.  A separate order in accordance with this memorandum of decision will be entered.

---

[2] Tr. 26-27 ("Despite the claimant's allegations of disability, the claimant reported that she lives independently, engages in self care and grooming, prepares meals, does laundry, washes dishes, cleans, drives, travels outside her home independently, shops in stores and attends college.  Further, she reported that she attended college during the relevant period, reads Harry Potter novels for pleasure, uses her computer to watch movies, shops in stores, pays bills, handles a bank account, attends weekly services, spends time with others, plays cards, finishes what she starts, follows directions 'very well,' and has no problems getting along with family, friends, neighbors, or authority figures.  The claimant has described a broad range of daily activities, which are limited to the extent one would expect, given the complaints of disabling symptoms and limitations.").

**DONE** and **ORDERED** this March 20, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE